**Freeland RILEY, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2001–SC–0753–MR.

Supreme Court of Kentucky.

May 22, 2003.

Rehearing Denied Dec. 18, 2003.

John Palombi, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant.

A.B. Chandler, III, Attorney General, Perry T. Ryan, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice COOPER.

Appellant Freeland Thomas Riley was convicted by a McCracken Circuit Court jury of one count of possession of marijuana and one count of possession of drug paraphernalia, both Class A misdemeanors. KRS 218A.1422(2); KRS 218A.500(5). Each offense was enhanced to a Class D felony by the jury's additional finding that Appellant was in possession of a firearm at the time the offenses were committed. KRS 218A.992(1)(b). The marijuana charge was further enhanced by the jury's finding that he was a persistent felony offender in the first degree ("PFO first-degree").[1] KRS 532.080(3). Appellant was sentenced to a total of twenty years in prison and appeals to this Court as a matter of right. Ky. Const. § 110(b).

Appellant had been previously convicted on December 17, 1987, in the Ballard Circuit Court of burglary in the third degree and felony theft for which he was sen-

---

1. The drug paraphernalia conviction was not subject to PFO enhancement. KRS 532.080(8); *Bolen v. Commonwealth*, Ky., 31 S.W.3d 907, 909 (2000).

tenced to three years in prison. He was subsequently convicted on July 25, 1994, in the McCracken Circuit Court of one count of trafficking in a controlled substance in the first degree, three counts of trafficking in marijuana (less than eight ounces), and two counts of trafficking in marijuana (eight ounces or more, less than five pounds) for which he was sentenced to thirteen years in prison, subject to 380 days credit for time already served. He was released on parole on July 24, 1997, and moved into a mobile home behind his father's residence. As conditions of his parole, Appellant agreed, *inter alia,* that (1) he would not "purchase, own or have in [his] possession or control" a firearm, ammunition, or other dangerous instrument; (2) he would not use or possess any alcoholic beverages, narcotics, or controlled substances; (3) he would allow his parole officer to visit his residence at any time; and (4) the officer could conduct a search of his person or residence if the officer had reason to believe that he may have "illegal drugs, alcohol, volatile substance, or other contraband" on his person or property.

Around nine p.m. on November 16, 1999, Steve Campbell, a McCracken County probation and parole officer, accompanied by a deputy sheriff and another assistant, made a visit to Appellant's residence. The visit was in accordance with "Operation Night Vision," a cooperative agreement between the McCracken County probation and parole office and local police authorities by which parole officers would make home visits to parolees' residences at night under police protection. If any contraband was confiscated during the visit, the police authorities would process and retain custody of it for possible use in any subsequent legal proceedings. Officer Campbell initiated the visit by knocking on Appellant's door. When Appellant opened the door, Campbell advised that he was performing a "routine visit" as part of "Operation Night Vision" and that the additional officers were there for his (Campbell's) protection. Appellant allowed the officers to enter, then sat down on a chair near the front door. Immediately upon entry, Campbell observed a 30.06 rifle and a Remington twelve gauge shotgun laying on a bassinet within six to eight feet of where Appellant was sitting. Appellant claimed that the guns belonged to his father, who was living with him at the time, and volunteered that there were additional weapons located in his father's bedroom. Appellant then requested that the officers allow his sister-in-law to come to the residence and remove the weapons.

Suspecting that Appellant might be in possession and control of additional weapons, Campbell opened the drawer of an end table next to the chair on which Appellant was sitting and discovered a decorative tin can. Upon shaking the can and contemporaneously observing Appellant's change of demeanor as he did so, Campbell suspected that the can contained contraband. Upon opening the can, Campbell discovered seven bags containing approximately 46.5 grams of marijuana, rolling papers, a razor blade, and a set of "finger" measuring scales. Appellant then told Campbell that the "rest of the marijuana" was in a potato bin in his kitchen. Campbell proceeded to the bin and discovered two ziplock bags containing approximately 114.5 grams of marijuana. After Campbell had placed Appellant under arrest for parole violation, KRS 439.430(1), the officers conducted an extended search of the mobile home and recovered twelve additional firearms.

On December 30, 1999, a McCracken County grand jury issued a five-count indictment charging Appellant with (1) trafficking in marijuana less than eight ounces, second offense, while in possession of a firearm; (2) possession of a handgun by a convicted felon; (3) possession of a firearm by a convicted felon; (4) posses-

sion of drug paraphernalia while in possession of a firearm; and (5) PFO first-degree. (Counts 2 and 3 were severed for purposes of trial and count 3 was ultimately dismissed).

After an evidentiary hearing, the trial court overruled Appellant's motion to suppress the evidence seized from his residence. A petit jury ultimately acquitted Appellant of trafficking in marijuana under count 1 of the indictment but convicted him of the lesser-included offense of possession of marijuana, and also convicted him under count 4 of possession of drug paraphernalia. The jury further found that Appellant was in possession of a firearm at the time both offenses were committed and that he was a persistent felony offender in the first-degree. He was sentenced to twenty years imprisonment.

On appeal, Appellant asserts (1) the evidence obtained during the search of his residence should have been suppressed as the fruits of an illegal search; (2) there was insufficient evidence to support the firearm enhancement of the underlying offenses (thus, his convictions were for misdemeanors, which could not trigger PFO enhancement); (3) the jury should not have been instructed on PFO first-degree because the indictment charged him only with being a PFO in the second degree, and one of the prior convictions upon which the PFO enhancement was premised was invalid because he was never indicted for that offense; and (4) a twenty-year sentence for a misdemeanor offense (possession of marijuana) constitutes cruel and unusual punishment. For reasons hereinafter explained, we affirm.

## I. SEARCH AND SEIZURE.

Appellant claims that the search of his residence violated the Fourth Amendment to the United States Constitution and Section 10 of the Kentucky Constitution. He asserts that although his possession of the two firearms violated the express conditions of his parole agreement, the officers could not search the remainder of his residence without a warrant because they did not have a "reasonable suspicion" that a search of the residence would uncover "illegal drugs, alcohol, volatile substance, or other contraband." Alternatively, he asserts that the search was illegal because Officer Campbell's visit on the night in question was not "routine" but, rather, Campbell was acting as a "stalking horse" for the sheriff's department, i.e., the probation and parole officers were merely "puppets" in a coordinated police investigation meant to circumvent the strictures of the Fourth Amendment. Both arguments are meritless.

### A. Parole Search.

█ We note initially that Appellant only challenges the seizure of those items that were not in "plain view." *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971); *Hazel v. Commonwealth*, Ky., 833 S.W.2d 831, 833 (1992). He concedes in his brief that he "opened the door and let in" the officers, a concession consistent with the testimony at trial and at the suppression hearing; thus, the officers were lawfully inside the residence when they observed the two shotguns laying on the bassinet in Appellant's living room. The only issue is whether the search, conducted after the officers discovered the guns in plain view and after Appellant volunteered that there were other firearms in the mobile home, was valid.

█ Although a parolee's home, like any other, "is protected by the Fourth Amendment's requirement that searches be 'reasonable'," *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987), Appellant's status as a parolee diminished his expectation of privacy. *Id.* at 874, 107 S.Ct. at 3169; *see Wilson v. Commonwealth*, Ky., 998 S.W.2d

473, 474 (1999) ("The parole system allows for the early release of convicted criminals from prison, but does not grant complete freedom."). Thus, because of the "special needs" presented by law enforcement, a state may issue regulations allowing a probation or parole officer to search a probationer's or parolee's property without a warrant. *Griffin, supra,* at 873–74, 107 S.Ct. at 3168–69; *Wilson, supra,* at 474 n. 1. However, such regulations and the searches conducted pursuant thereto are still subject to the Fourth Amendment's general requirement of reasonableness. *Griffin, supra,* at 873–74, 107 S.Ct. at 3168–69.

In *United States v. Knights,* 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), the Court further elaborated upon what is "reasonable" in the context of a search of a probationer's or parolee's residence. The Court held in *Knights* that a warrantless search of a probationer's residence is reasonable under the Fourth Amendment when the search is supported by a reasonable suspicion that the probationer is engaged in criminal activity and such a search is authorized by a condition of probation. *Id.* at 121, 122 S.Ct. at 593; *see also Coleman v. Commonwealth,* Ky., 100 S.W.3d 745, 752 (2002); *Wilson, supra,* at 475 (warrantless search of parolee's automobile held valid based upon reasonable belief of parole officer that automobile contained contraband). In support of this conclusion, the Court explained, "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy in-

terests is reasonable." *Knights, supra,* at 121, 122 S.Ct. at 593.

One of the conditions of Appellant's parole was that he refrain from "possession or control" of a firearm. In addition, Appellant knew that he "may be subject to search and seizure if [his parole officer] has reason to believe that [he] may have illegal drugs, alcohol, volatile substance, *or other contraband* on [his] person or property." (Emphasis added.) "Contraband" is defined in the penal code as "any article or thing which a person confined in a detention facility is prohibited from obtaining or possessing by statute, departmental regulation, or posted institutional rule or order." [2] KRS 520.010(1). Firearms are considered to be "dangerous contraband." KRS 520.010(3); KRS 500.080(4)(b). As a paroled convicted felon, Appellant was prohibited by statute from possessing a firearm. KRS 527.040. These conditions of parole are imposed pursuant to regulations adopted by the Kentucky Parole Board. 501 KAR 1:030, § 6 (2002). In addition, Department of Corrections Policy No. 27–16–01 outlines the standard by which a parole officer may conduct a warrantless search of a parolee or his residence:

> If Reasonable Suspicion Exists to believe that an offender is violating a condition of supervision or the officer has possession of evidence of a violation of the terms and conditions of supervision, an officer may search without a warrant.

Kentucky Corrections Policy No. 27–16–01 (Search; Seizure; Chain of Custody; Disposal of Evidence) IV(1)(A)(1), at 3. This policy was incorporated by reference into regulations adopted by both the Justice Cabinet and the Department of Corrections. 501 KAR 6:020E § 1(c) (2002).[3] By

---

**2.** Although Appellant was not technically "confined in a detention facility," one of the conditions of his release on parole was that he continue to refrain from possessing "contraband." Presumably that would be the

same contraband that he had been precluded from possessing while confined.

**3.** For statutory authority, *see* KRS 196.035; KRS 197.020(1)(a); KRS 439.470(1).

signing the release agreement, Appellant knowingly agreed to conditions that, as a parolee, reduced his expectation of privacy in his residence to the extent that his parole officer could conduct a search upon "reasonable suspicion" that he was in possession of a firearm.

Officer Campbell's personal observation of two firearms in plain view and Appellant's advice that there were more firearms in the rear bedroom supported Campbell's reasonable suspicion that there might be other firearms concealed within the residence. That suspicion warranted opening the drawer of the end table next to the chair on which Appellant was then sitting. *Cf. Clay v. Commonwealth,* Ky., 818 S.W.2d 264, 265 (1991) (parole officer's observation of bullets laying in plain view on a dresser next to the bed on which defendant was lying sufficed to support subsequent search). Campbell was not required to establish ownership of the firearms or to accept Appellant's claim that they were not owned by him. Knowledge that there were firearms present in Appellant's residence was sufficient to trigger the requisite reasonable suspicion to justify the subsequent search.

### B. *"Stalking Horse".*

Appellant's "stalking horse" defense is premised upon his assertion that "Operation Night Vision" was a subterfuge to enable other police agencies to conduct unconstitutional searches of parolees' residences under the guise of a parole officer's "routine visit." Prior to the decision in *Knights, supra,* a majority of federal courts had, indeed, held that a search was unlawful when the probation or parole officer was acting as a "stalking horse" for a police investigation, *i.e.,* when the officer's visit was but a ruse for an entry and search by the accompanying police officers. *See United States v. Martin,* 25 F.3d 293, 296 (6th Cir.1994) ("[I]t is impermissible for a probation search to serve as subter-

fuge for a criminal investigation."); *United States v. Grimes,* 225 F.3d 254, 259 (2nd Cir.2000); *United States v. McFarland,* 116 F.3d 316, 318 (8th Cir.1997); *United States v. Ooley,* 116 F.3d 370, 372 (9th Cir.1997); *United States v. McCarty,* 82 F.3d 943, 947 (10th Cir.1996); *United States v. Coleman,* 22 F.3d 126, 129 (7th Cir.1994); *Shea v. Smith,* 966 F.2d 127, 132 (3rd Cir.1992). However, in the process of reversing the suppression of evidence seized in a probation search that was for "investigatory," as opposed to "probationary," purposes, *Knights* eliminated the "stalking horse" defense.

> Because our holding rests on ordinary Fourth Amendment analysis that considers all the circumstances of a search, there is no basis for examining official purpose. With the limited exception of some special needs and administrative search cases, we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers.

*Knights, supra,* at 122, 122 S.Ct. at 593 (citations and quotations omitted). The Ninth Circuit Court of Appeals has subsequently held in *United States v. Stokes,* 292 F.3d 964 (9th Cir.2002), that, in light of *Knights,* "our circuit's line of cases holding searches of probationers invalid on the ground that they were subterfuges for criminal investigations is, in that respect, no longer good law." *Id.* at 967 (*overruling Ooley, supra* ).

We agree that *Knights* eliminated the so-called "stalking horse" defense. Thus, we need not engage in a subjective examination of the official purpose behind this particular "Operation Night Vision" visit. We simply hold that the search of the remainder of Appellant's mobile home did not violate his constitutional right to be secure against unreasonable searches and seizures.

## II. FIREARM ENHANCEMENT.

■ Appellant admits that he was in possession of the marijuana and drug paraphernalia and does not challenge the sufficiency of the evidence supporting his convictions of those offenses. He does, however, contend that the trial court erroneously denied his motion for a directed verdict as to the firearm enhancement of those convictions because there was insufficient evidence of a "nexus" between the firearms discovered in his residence and his possession of the marijuana and drug paraphernalia. *See Commonwealth v. Montaque*, Ky., 23 S.W.3d 629, 632 (2000).

■ The firearm enhancement statute, KRS 218A.992(1), applies whether the defendant's possession of the firearm was actual or constructive. *Montaque*, at 632; *Houston v. Commonwealth*, Ky., 975 S.W.2d 925, 927 (1998). "Constructive possession exists when a person does not have actual possession but instead knowingly has the power and intention at a given time to exercise dominion and control of an object, either directly or through others." *Johnson v. Commonwealth*, Ky., 90 S.W.3d 39, 42 (2002) (quotation omitted). Here, each of the officers who searched Appellant's residence on the night of his arrest testified that they saw two firearms in "plain view" within six to eight feet of where Appellant was seated. Appellant did not controvert this testimony but only asserted that the weapons belonged to his father and were not within his immediate reach.

Appellant could have easily exercised dominion and control over the two firearms which were laying in an unobstructed location only six to eight feet from where he was sitting and where the marijuana

and drug paraphernalia were discovered. Therefore, this evidence was sufficient to support a reasonable juror's conclusion that Appellant had constructive possession of the firearms. *Id.* at 43 (constructive possession established by proof that the firearm was seized at Appellant's residence at the time of his arrest); *Houston, supra*, at 928–29 (defendant was in constructive possession of firearms located in the apartment where he was arrested because firearms were in "plain view and were easily accessible").

■ Under *Montaque, supra*, a nexus is shown if the firearms were within the defendant's constructive possession *and* "immediate control" at the time of his arrest.[4] 23 S.W.3d at 632–33. We easily conclude that the two firearms on the bassinet were within Appellant's "immediate control." Under *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the area within a defendant's "immediate control" is "the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 763, 89 S.Ct. at 2040. Neither party disputes that the distance between Appellant and the firearms was only six to eight feet. One of the two weapons was loaded and both were easily-accessible to Appellant. *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981) (the entire interior of a vehicle and all containers therein would be considered within defendant's "immediate control"); *Collins v. Commonwealth*, Ky., 574 S.W.2d 296, 298 (1978) (air conditioner that was "four to seven feet" from defendant's position in motel room was within his "immediate control"); *see also United States v.*

---

4. *But cf. Johnson v. Commonwealth*, Ky., 105 S.W.3d. 430, 437 n. 1 (2003) (noting that *Montaque* test will be satisfied only when, in addition, the defendant is arrested "while committing the drug offense," but that, in many cases, such as the instant case, the distinction is immaterial because the defendant was, in fact, arrested while committing the drug offense).

*Williams*, 104 F.3d 213, 215 (8th Cir.1997) (noting that there are "numerous" cases in which courts found a "nexus" when "weapons and drugs were located in different rooms within a residence, but were found to be readily available during the drug transactions."). Here, Appellant, the weapons, and the marijuana and drug paraphernalia were all in the same room. Accordingly, under *Montaque, supra*, there was sufficient evidence of both possession and nexus to support a firearm enhancement under KRS 218A.992(1).

### III. PFO ENHANCEMENT.

A. *Amendment of Indictment.*

■ Appellant next argues that his sentence must be vacated because the trial court erroneously permitted count 5 of the indictment to be amended to change the charge from PFO second-degree to PFO first-degree. Defense counsel raised the issue by way of objection to the proposed penalty phase instructions immediately prior to commencement of the penalty phase of the trial. Although the caption of the indictment reflected that count 5 charged PFO first-degree, the body of count 5, in fact, charged PFO second-degree, *viz:*

*COUNT 5:*

THE GRAND JURY CHARGES:

That the above-named defendant, Freeland Riley, who is more than 21 years of age, has previously committed and been convicted for the following prior *felony* and *is now charged as being a Persistent Felony Offender in the Second Degree;*

(1) That on or about July 22[sic], 1994, the defendant, Freeland Riley, appeared in the McCracken Circuit Court, McCracken County, Kentucky, a court of general criminal jurisdiction, pursuant to indictment No. 93–CR–00217, and was convicted of the offenses of Trafficking

in a Schedule II Non–Narcotic, three counts of Trafficking in Marijuana less than Eight Ounces, and three counts of Trafficking in Marijuana Over Eight Ounces, and sentenced to thirteen (13) years, in the Department of Corrections of Kentucky;

(2) That on or about December 17, 1987, the defendant, Freeland Riley, appeared in the Ballard Circuit Court, Ballard County, Kentucky, a court of general criminal jurisdiction, pursuant to Indictment No. 87–CR–00010, and was convicted of the offense of Third–Degree Burglary and Theft by Unlawful Taking, and sentenced to five (5) years probation, in the Department of Corrections of Kentucky.

(Emphasis added.) The trial judge found that the PFO second-degree charge within the body of count 5 was a clerical error (the scrivener may have copied from the wrong form) and effectively corrected the error and thereby modified the body of the indictment by instructing the jury on PFO first-degree.

■ "Strictly speaking, the caption of the indictment itself, and the facts recited therein are not part of the finding of the grand jury." 41 Am.Jur.2d, *Indictments and Informations* § 71 (1995). Thus, in case of a variance between the language of the caption and the language of the body of an indictment, the language of the body controls. *United States v. Martinez*, 981 F.2d 867, 872 (6th Cir.1992) ("The charging language is in the body of [the indictment] . . . ."); *People v. Williams*, 37 Ill.2d 521, 229 N.E.2d 495, 497 (1967); *State v. Trueax*, 315 Or. 396, 845 P.2d 1291, 1293 (1993) (en banc) (where caption indicated charge was "sodomy in second degree" but body charged "sodomy in the third degree," conviction of sodomy in the second degree reversed); *Thibodeaux v. State*, 628 S.W.2d 485, 487 (Tex.Ct.App.1982).

Thus, the issue becomes whether the trial judge erred in allowing the indictment to be effectively amended to change the charge in count 5 from PFO second-degree to PFO first-degree.

Criminal Rule 6.16 permits an indictment to be "amended any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced. If justice requires, however, the court shall grant the defendant a continuance when such an amendment is permitted."

Appellant does not claim that he did not have notice of the grand jury's intent to charge him as a PFO first-degree. In addition to the recitation in the caption of the indictment, Appellant was served on the day of his arraignment, January 21, 2000, with both a warrant on the indictment and a criminal summons, each reflecting that he had been indicted as a PFO first-degree. The transcript of the grand jury proceedings, which had been made available to Appellant in response to a discovery request, RCr 5.16(3), reflects that the grand jury voted to charge Appellant as a PFO first-degree. Count 5, itself, recites that the charge is premised upon two prior felony convictions as opposed to only one. *Compare* KRS 532.080(3) *with* KRS 532.080(2). Finally, the videotape of the pretrial conference held on March 31, 2000, reveals a sidebar discussion between the prosecutor and defense counsel in which the prosecutor clarified to defense counsel that Appellant was charged as a PFO first-degree. Thus, Appellant was aware of the clerical error in the indictment and was neither surprised nor precluded from adequately preparing his defense. He did not request a continuance. Therefore, we conclude that his substantial rights were not prejudiced. The only remaining issue is whether the amendment charged an additional or different offense.

PFO is a status, not a criminal offense. *Hardin v. Commonwealth*, Ky., 573 S.W.2d 657, 661 (1978). In *Luna v. Commonwealth*, Ky.App., 571 S.W.2d 88 (1977), the defendant admitted during his own testimony at his trial for trafficking in a controlled substance that he had previously been convicted of another trafficking offense. The trial judge then allowed the Commonwealth to amend the indictment to charge second-offense enhancement under then KRS 218A.990(2) (repealed 1992 Ky. Acts, ch. 441, § 30). The Court of Appeals affirmed, holding that KRS 218A.990(2) did not define a separate offense but only permitted the introduction of evidence necessary to determine the penalty range for the charged offense. *Id.* at 89. It also held that the amendment did not affect the defendant's substantial rights because he was aware of his own criminal record and even admitted to the prior conviction. "In no way was he prevented from preparing his defense more adequately, nor were there any surprises." *Id.* Other jurisdictions have reached the same conclusion under similar circumstances. *Baumgarner v. State*, 316 Ark. 373, 872 S.W.2d 380, 384 (1994) (amendment of indictment to add "habitual offender" allegation did not charge additional offense but only authorized evidence relative to punishment upon defendant's conviction of indicted offense); *Howard v. State*, 268 Ind. 589, 377 N.E.2d 628, 629 (1978) (amendment of information to add "habitual criminal" count did not charge separate offense but only provided a more severe penalty for the indicted offense); *State v. Whitten*, 622 A.2d 85, 86 (Me.1993) (amendment to criminal complaint to charge prior DUI conviction for enhancement purposes did not charge additional offense); *see also* 41 Am.Jur.2d, *supra*, at § 175 ("Changing the severity of the punishment upon conviction does not change the degree of the crime, and such an amendment is permissible."). We con-

clude that the trial judge did not abuse his discretion in permitting the amendment.

B. *Prior judgment.*

■ Appellant next argues that his sentence must be set aside because the 1994 McCracken Circuit Court conviction that was used for PFO first-degree enhancement was invalid. Specifically, while the 1994 *judgment* recites that Appellant's conviction was of "trafficking in a controlled substance in the first degree," a Class C felony, KRS 218A.1412(2), the 1993 *indictment* on which that judgment was premised, did not charge him with that offense but with "trafficking in a schedule II non-narcotic," a Class D felony. KRS 218A.140(1) (amended, 1992 Ky. Acts, ch. 441, § 5); KRS 218A.990(2)(a) (repealed, 1992 Ky. Acts, ch. 441, § 30). The error probably relates to the facts that the Controlled Substances Act was substantially amended by the 1992 General Assembly, 1992 Ky. Acts, ch. 441, effective July 14, 1992, and that some of the offenses charged in the 1993 indictment were committed before July 14, 1992, and others were committed after that date. The trafficking offense was committed on July 7, 1992, which explains why the indictment was under the subsequently repealed statutes.

■ Appellant is obviously correct in his assertion that the 1994 judgment recites a conviction for an offense for which he was not indicted. Nevertheless, (1) the sentence imposed for that conviction was five years imprisonment, which falls within the penalty range for either a Class D or Class C felony, KRS 532.060(2)(c) and (d); (2) the same judgment also contains two additional felony convictions for trafficking in marijuana (more than eight ounces, less than five pounds), Class D felonies, KRS 218A.1421(3)(a) (offenses committed after July 14, 1992), the validity of which Appellant does not contest; and (3) a prior judgment of conviction is valid until set

aside by the court that entered it and cannot be collaterally attacked in a PFO proceeding. *Webb v. Commonwealth,* Ky., 904 S.W.2d 226, 229 (1995). Thus, even if Appellant's 1994 conviction of trafficking in a controlled substance in the first degree were invalid (an issue we do not reach), such does not affect the validity of the PFO first-degree enhancement of his present conviction. In fact, the trial judge did not instruct the jury at the penalty phase of the trial *sub judice* that it could find Appellant to be a PFO first-degree on the basis of his 1994 conviction of trafficking in a controlled substance in the first degree but only on the basis of his conviction in the same judgment of trafficking in marijuana (more than eight ounces, less than five pounds).

■ The only remaining issue in this respect is whether Appellant could have been prejudiced by the prosecutor's reference to Appellant's prior conviction for "trafficking in a controlled substance" during his opening remarks at the penalty phase. The trial court cured any possible error by giving the following admonition:

A moment ago, [the prosecutor] stated in his opening statement that Mr. Riley had among his convictions, a conviction for, I think he said, first-degree trafficking in a controlled substance. That was not correct. He did not have that conviction. You will be given the evidence here in a minute of what his actual convictions were.

Regardless, even though the 1993 indictment charged Appellant with "trafficking in a schedule II non-narcotic," the actual name of the offense was "trafficking in a controlled substance," KRS 218A.140(1) (now amended), and the identification of the substance as a schedule II non-narcotic only affected the penalty to be imposed upon conviction of that offense. KRS 218A.990(2)(a) (now repealed). *See, e.g.,*

Palmore & Cooper, *Kentucky Instructions to Juries (Criminal)* §§ 7.16, 7.17 (4th ed. Anderson (interim rev.) 1990).

## IV. CRUEL AND UNUSUAL PUNISHMENT.

 Appellant's final argument is that his twenty-year prison sentence violates the proscription against cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution and Section 17 of the Kentucky Constitution. Appellant admittedly did not raise this issue before the trial court but we will review it for "manifest injustice" under RCr 10.26.

 The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Section 17 of the Kentucky Constitution is identical, except that it proscribes "cruel punishment" instead of "cruel and unusual punishments." We regard this variation in phraseology as a distinction without a difference. In *Weber v. Commonwealth*, 303 Ky. 56, 196 S.W.2d 465 (1946), our predecessor court noted that "cruel punishment" is regarded as "primarily relating to the kind and character or method of punishment, referring to inhumane or barbarous treatment *or punishment unknown to the common law or which has become obsolete with the progress of humanitarianism.*" *Id.* at 469 (emphasis added). "Cruel punishment" can relate to the severity in the amount or duration of the punishment, but if the punishment is within the maximum prescribed by the statute violated, courts generally will not disturb the sentence. *Id.* at 469–70; *see also Monson v. Commonwealth,* Ky., 294 S.W.2d 78, 80 (1956), *overruled on other grounds by Owens v. Commonwealth,* Ky., 487 S.W.2d 897, 900 (1972); *Mills v. Commonwealth,* 305 Ky. 44, 202 S.W.2d 1005, 1007–08 (1947); *McElwain v. Commonwealth,* 289 Ky. 446, 159 S.W.2d 11, 12 (1942); *Bradley v. Commonwealth,* 288 Ky. 416, 156 S.W.2d 469, 471 (1941).

Every criminal offense in this jurisdiction is defined by statute and all penal statutes set maximum limits on penalties for those offenses. Appellant was convicted of one count of possession of marijuana, a Class A misdemeanor in violation of KRS 218A.1422, and one count of possession of drug paraphernalia, a Class A misdemeanor in violation of KRS 218A.500. The penalties for both offenses were enhanced to Class D felonies pursuant to KRS 218A.992(1)(b) because the jury found beyond a reasonable doubt that Appellant was in possession of a firearm when the offenses were committed. A Class D felony carries a penalty of one to five years imprisonment. KRS 532.060(2)(d). Because the jury also found that Appellant was a PFO first-degree, the possible range of penalties for his marijuana conviction was enhanced to ten to twenty years in prison. KRS 532.080(6)(b). Thus, Appellant's sentence did not exceed the maximum aggregate sentence (twenty years) allowed under KRS 532.110(1)(c).

 Appellant makes a general claim that his ultimate sentence is disproportionate to the nature of his offenses. *Solem v. Helm,* 463 U.S. 277, 290, 103 S.Ct. 3001, 3009, 77 L.Ed.2d 637 (1983). Any proportionality analysis of a claim of cruel punishment should consider three factors:

(1) The gravity of the offense and harshness of the penalty;

(2) The sentences imposed on other criminals in the same jurisdiction;

(3) The sentences imposed for commission of the same crime in other jurisdictions.

*Id.* at 290–92, 103 S.Ct. at 3010–11.

 Appellant asserts that twenty years in prison is too severe a penalty for

possession of marijuana and drug paraphernalia while in possession of a firearm. However, it was Appellant's conviction for being a persistent felony offender in the first-degree that enhanced his maximum aggregate sentence from a possible ten years (the jury initially recommended that the underlying sentences run consecutively) to twenty years imprisonment. *Commonwealth v. Messex*, Ky., 736 S.W.2d 341, 342 (1987). "[A] State is justified in punishing a recidivist more severely than it punishes a first offender." *Solem, supra*, at 296, 103 S.Ct. at 3013.

In *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), the United States Supreme Court held that a life sentence imposed upon a third-offense felon for his conviction of obtaining $120.75 by false pretenses did not constitute cruel and unusual punishment, despite the fact that his prior convictions were also for non-violent offenses. *Id.* at 285, 100 S.Ct. at 1145. In *Solem, supra*, the Supreme Court held it was cruel and unusual punishment to impose a penalty of life in prison without possibility of parole upon a third-offense felon convicted of uttering a worthless check in the amount of $100.00, and whose prior convictions were all for non-violent offenses. 463 U.S. at 303, 103 S.Ct. at 3016–17. However, *Solem* did not overrule *Rummel v. Estelle* but distinguished it on the basis that the defendant in *Rummel* would be eligible for parole in twelve years, whereas the defendant in *Solem* was ineligible for parole. *Id.* at 297, 103 S.Ct. at 3013.

Nor are the sentences imposed here disproportionate to sentences imposed on other habitual offenders convicted of firearm-enhanced drug offenses in this jurisdiction. *E.g., Houston v. Commonwealth*, Ky., 975 S.W.2d 925, 927 (1998) (firearm-enhanced trafficking in cocaine charge further enhanced to twenty-four years imprisonment

as a result of defendant's status as a PFO second-degree).

For satisfaction of the third prong of the *Solem* test, we need only note that habitual criminal statutes are common in many jurisdictions, and sentences imposed within the parameters of these statutes have been upheld as constitutional numerous times. *See, e.g., People v. Deroulet*, 48 P.3d 520, 528 (Colo.2002) (upholding thirty-six-year sentence imposed in accordance with habitual criminal statute); *State v. Robinson*, 831 So.2d 460, 468–69 (La.Ct.App.2002) (upholding mandatory life sentence for conviction of trafficking in cocaine, based upon defendant's status as four-time felony offender under habitual criminal statute); *Boyd v. State*, 767 So.2d 1032, 1034 (Miss. Ct.App.2000) (upholding thirty-year sentence without possibility of parole where defendant was habitual criminal). Recently, the United States Supreme Court upheld in *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003), California's "three strikes" law, perhaps the strictest habitual offender statute in the nation, against an Eighth Amendment challenge. *Id.* at ——, 123 S.Ct. at 1175. The Court held that the imposition of two life sentences against a three-time felony offender for his conviction of two felony theft counts for stealing approximately $150.00 worth of videotapes was not so "grossly disproportionate" as to invoke Eighth Amendment scrutiny. *Id.*

In the present case, Appellant received a sentence of twenty years imprisonment, a sentence within the penalty range provided by the applicable statutes. He will be eligible for parole after serving twenty percent of his sentence. KRS 532.080(7); KRS 439.340; 501 KAR 1:030 § 3(a). Therefore, on the basis of our proportionality analysis, we conclude that Appellant's aggregate sentence of twenty years was not constitutionally prohibited.

Accordingly, the judgment of convictions and the sentences imposed by the McCracken Circuit Court are affirmed.

All concur.